1  John Vodonick, Ph.D. (SB#063089)
   Vodonick Law
2  PO Box 763
   Nevada City. California 95959
3  Telephone 530 478 1078

4  Attorney for Plaintiffs

5

6              UNITED STATES DISTRICT COURT

7            EASTERN DISTRICT OF CALIFORNIA

8                              ) Case No.
   The Original Sixteen to One  )
9  Mine, Inc. a California       )
   Corporation, Michael Miller,  ) Original Complaint
10 Hugh Dan O'Neill III, Robert  )
   Besso, Jonathan Ferrell, Tom  )
11 Woodfin, Keith Robertson,     )
                                 ) (JURY DEMANDED)
12          Plaintiffs,          )
                                 )
13 vs.                           )
                                 )
14 Quartzview, Inc. a California )
   Corporation, Roger Haas, Simon )
15 P. Westbrook, Douglas Lockie, )
   Douglas W. Charlton, and Charles )
16 Crompton Jr., Does 1 through  )
   100, inclusive.               )
17                 Defendants.   )
   _____
18

19     COME now plaintiffs and for claim for relief against defendants

20 and each of them alleges as follows:

21

22

23

24

25

                              1

1

2                          GENERAL ALLEGATIONS

3                         Jurisdiction and Venue

4    1.   This Court has Federal Question Jurisdiction of this case

5    pursuant to 29 USC 1330, 15 USC 78aa, 15 USC § 78i(e), 15 USC §

6    78j(b), and 15 USC, § 78t and 15 USC § 78n.

7    2.   Plaintiffs request that this Court exercise Pendent

8    Jurisdiction over all non-Federal Claims embraced by the operative

9    facts alleged hereinafter.

10   3.   Venue is correct in the Eastern District of California

11   inasmuch as the Mining property that Plaintiff the Original

12   Sixteen to One Mine, Inc. is located in this district and

13   Plaintiff conducts business in this district, much if not all of

14   the acts and omissions alleged hereinafter occurred within this

15   district, and the Defendant Quartzview, Inc. acts and conducts

16   business within this district.

17   Parties

18   4.   Plaintiff the Original Sixteen to One Mine, Inc. (hereinafter

19   OSTO is a California Corporation with a principal place of

20   business and doing business in Alleghany, Sierra County,

21   California and has been in existence for over 100 years.  It is

22   the oldest operating gold mine in the United States.  OSTO is

23   publicly traded, with holders of its securities resident in over

24   30 states and several foreign countries.  There are fourteen

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1  million, eight hundred seventy thousand and six hundred thirty-one

2  share of OSTO outstanding.

3  5.   Plaintiff Michael Miller is a holder of the securities of

4  OSTO. Is a director and President of OSTO and an "elder" within

5  the meaning of Calif. Welf. & Inst. C. § 15610.27.

6  6.   Hugh Dan O'Neill, III is a holder of a of the securities of

7  the securities of OSTO and a director and Secretary of OSTO and an

8  "elder" within the meaning of Calif. Welf. & Inst. C. § 15610.27.

9  7.   Robert Besso is a holder of the securities of OSTO and an

10 "elder" within the meaning of Calif. Welf. & Inst. C. § 15610.27.

11 8.   Tom Woodfin is a holder of the securities of OSTO and an

12 "elder" within the meaning of Calif. Welf. & Inst. C. § 15610.27.

13 9.   Keith Robertson is a holder of the securities of OSTO, a

14 director of OSTO and an "elder" within the meaning of Calif. Welf.

15 & Inst. C. § 15610.27.109.

16 10.  Jonathan Ferrell is a holder of the securities of OSTO.

17 10.  Quartzview Corporation is a California Corporation with a

18 principal place of business and doing business at Scotts Valley,

19 Ca.

20 11.  Roger Haas is an individual resident in Scotts Valley,

21 California, and a holder of the securities of Quartzview, Inc. and

22 the Original Sixteen to One, Mine Inc. and purports to be

23 President and director of Quartzview Corporation.

24 12. Simon P. Westbrook is an individual resident of Scotts Valley,

25

1 | California, and the agent for service of process of Quartzview

2 | Corporation and a director of Quartzview Corporation.

3 | 13. Douglas Lockie is an individual resident of California and a

4 | director of Quartzview Corporation. He is not and has merely

5 | wrongfully and fraudulently appropriated the office and authority.

6 | Douglas W. Charlton maintains an address in Alleghany, Ca.

7 | 14.   Douglas W. Charlton purports to be a director, Chief

8 | Executive Officer and Secretary of OSTO. In fact, he is not and

9 | has merely wrongfully and fraudulently appropriated those offices

10 | and authority. Douglas W. Charlton maintains an address in

11 | Alleghany, Ca.

12 | 15.   Charles Crompton Jr. purports to be a director of OSTO. In

13 | fact, he is not and has merely wrongfully and fraudulently

14 | appropriated that office and authority. Charles Crompton Jr.

15 | maintains an address in Alleghany, Ca.

16 | 16. Plaintiffs are unsure of the true names or capacities of the

17 | defendants named herein as Does 1 through 100 inclusive who are

18 | controlling individuals, or otherwise caused or contributed to the

19 | wrongful acts or omissions alleged hereinafter, and for that

20 | reason sues said defendants by such fictitious names.  Plaintiffs

21 | will amend this complaint to reflect the true names and capacities

22 | when the same have been ascertained.

23 | Background Facts and General Allegations

24 | 17.   At all times material and mentioned herein OSTO lawfully

25 |

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1   adopted and maintained its Bylaws and strictly maintained its

2   organizational structure and activities in conformance therewith.

3   18.   During 2011 Defendants represented to Plaintiff Miller and

4   OSTO that Quartzview, Inc. was developing "deep sensing"

5   technologies that would enable it to detect the presence of gold

6   at a range of up to ten feet though solid quartz. Defendants

7   advised that the so called "deep sensing" technology was in the

8   development stage and would need a test bed for purposes of

9   creating an investment proposal to raise capital for further

10  development of their existing technology, and proposed that due to

11  its notoriety and proven value, the OSTO would be a suitable

12  location to test the developing technology and enhance the

13  attractiveness of such an investment in the purported proprietary

14  technology of Quartzview. In fact, the vaunted "deep sensing

15  technology" did not exist but was actually "vapor wear" and only

16  utilized commonly available mineral detection technology.

17  19.   Defendants proposed to OSTO that Quartzview, Inc. test its

18  technology in the workings of the OSTO. OSTO was agreeable to that

19  proposal so long as rigorous production schedules, confidentiality

20  and scope of project protocols be agreed upon.

21  20.   On or about October 30, 2012 Quartzview and OSTO entered into

22  a License and Service Agreement in writing. A true and correct

23  copy of such License and Service Agreement is attached hereto as

24  exhibit "A". In addition, on or about the same date, Plaintiffs

25

5

1  insisted upon and the Parties entered into a further

2  Confidentiality Agreement, A true and correct copy of such

3  Confidentiality Agreement is attached hereto as exhibit "B".

4  21.   Thereafter and pursuant to the terms of exhibits "A" and "B"

5  Quartzview exercised its license to purportedly test the

6  effectiveness of its technology and to justify further funding of

7  Defendants' enterprise by investors.

8  22.   The technology and devices used by Quartzview failed to

9  locate any gold targets whatsoever at any time and none of the

10  production schedules contained in exhibit "A" were met.

11  23.   During its purported exercise of its license pursuant to

12  exhibit "A" and contrary to the provisions of exhibits "A" and

13  "B", Defendants investigated and gathered information about and

14  concerning the management, ownership, financial condition,

15  strategic planning and personal information concerning employees

16  of and other proprietary and confidential information of and

17  concerning OSTO and divulged and disclosed such confidential

18  information indiscriminately for the purpose and intent of

19  depressing the value of the securities of OSTO, replacing the

20  management of OSTO, gaining control of OSTO and convincing their

21  investors to continue to fund Quartzview.

22  24.   At some time presently unknown to Plaintiffs, Defendants,

23  acting individually and not as the agent, servant or employee of

24  any corporate defendant did agree among themselves to a variety of

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1   acts and omissions intended to manipulate through false and

2   misleading statements intended and calculated for the purpose of

3   depressing the value of the severities of OSTO, creating doubt and

4   distrust of the management of OSTO and to gain control of OSTO

5   thought such manipulation. Defendants committed the acts,

6   omissions and representation set forth hereinafter in pursuit to

7   said agreement. Defendants damaged Plaintiffs and continue to

8   damage Plaintiffs in the manner and to the extent set forth

9   herein. The last act necessary to complete such conspiracy and

10  agreement occurred on the occasion of the embezzlement of the bank

11  account of OSTO as herein alleged.

12  25. Defendants engaged in a calculated series of statement, acts

13  and omissions intended to cast the OSTO and its management in an

14  unfavorable light, to depress the value of its stock and to

15  further their plan to take control of the OSTO.  The statements,

16  acta and representations were as follows:

17      A. On 06/16/2016 Defendants Haas and Quartzview authorized

18  and paid for the preparation and publication of a document

19  authored by Defendant Charlton entitled "Preliminary Conditions

20  Assessment 16 to 1 Mine". The document is conspicuously

21  watermarked as "Strictly Confidential". The stated purpose of the

22  document is to replace control of the OSTO "With the inferred low

23  valuation of the company, attracting capital will be difficult.

24  This means that exits for shareholders will be limited, and a

25

7

1   future of declining share value is likely as Company assets are

2   liquidated to pay for ongoing operating cost and increasing

3   liabilities. A condition of capitalization should be replacement

4   of current Management with a team of technically and financially

5   competent executives and specialists." The document contains

6   false, misleading and manipulative statement. Clearly calculated

7   to influence control of OSTO.  Regardless of the notation of

8   confidentiality, Defendants and each of them gave the document to

9   stock-holders of OSTO for the purpose of gaining control.

10      B. On or about 11/23/2016 Defendants promised a former

11  employee of OSTO that Defendants would employ him after they took

12  control of the OSTO if they filed a complaint with the Sierra

13  County Sheriff alleging that a thousand gallons of waste oil was

14  buried on the property of the OSTO. The Sheriff of Sierra County

15  closed the case for lack of evidence. Approximately two years

16  later another former employee (and associate of the first) was

17  again promised compensation when Quartzview gained control of the

18  corporation reported that he had participated in the oil disposal.

19  And he did.  Based upon the former employees' testimony the

20  District Attorney of Sierra County did file a criminal complaint

21  which was dismissed for a lack of evidence.  Nonetheless,

22  Defendants publicized this complaint to the stockholders in OSTO

23  and the general public for the purpose of gaining control of OSTO.

24      C. On or about 08/17/2018 Defendant Haas filed a report with

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1  the Nevada County Sheriff that explosives had been stolen from the
2  explosive magazine of OSTO. This was false and no action was
3  taken, nonetheless Defendants published this statement to the
4  general public and to stock holders of OSTO to again disparage
5  management and in furtherance of the plan to obtain control of
6  OSTO.

7  D. On July 15, 2022 Defendant represented to the California
8  Central Valley Regional Water Quality Control Board that the OSTO
9  surface property contained toxic solid waste and Defendants owned
10 the water rights. This was false and untrue and The Regional Water
11 Quality Control Board took no action upon this report. Again,
12 knowing of the falsity of the representation Defendants published
13 this statement to the general public and to the stock holders of
14 OSTO in an effort to gain control.

15 E.   On a date presently unknown to Plaintiffs, Defendants
16 represented to the United States Dept. of Labor Mine Safety and
17 Health Administration that OSTO was being operated in a hazardous
18 manner. Specifically, that some of the employees of the mine used
19 drugs and carried firearms. No citation was issued by the Dept. of
20 Labor Mine Safety and Health Administration, but nonetheless
21 Defendants used this incident to manipulate the stock and
22 stockholders in OSTO to gain control.

23 F.  On 08/21/2018 Defendant Haas contacted the State of
24 California Insurance fund and reported that OSTO had

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1  misrepresented its employee census and engaged in fraudulent

2  conduct. The California Insurance fund investigated the charge and

3  found it to be untrue.  Nonetheless, Defendants represented to the

4  general public and to the stock holders of OSTO that it was true

5  in Defendants effort to manipulate the price of the stock of OSTO,

6  reduce confidence in the management of OSTO and gain control of

7  OSTO.

8     G. On dates unknown to Plaintiffs Defendants suborned the

9  employees of OSTO and engaged them to secrete surveillance cameras

10 and vehicle location devices in the workings of OSTO and in its

11 vehicles in efforts to manufacture proof of unsafe working

12 conditions or practices and the theft of valuable ore.

13 26. Defendants made such representations to said boards and

14 regulatory agencies, law enforcement and to owners of the

15 securities of OSCO to manipulate the market for OSTO, suppress the

16 value of the outstanding shares, to depreciate the ability of

17 management and gain control of OSTO

18 27. Defendant Haas demanded a list of the owners of the securities

19 of OSTO and their addresses and obtained an order of the Superior

20 Court of Sierra County requiring that the management of OSTO

21 provide that information to him for his personal use and not for

22 the use by Quartzview. Regardless of the order of Court and the

23 provisions of California Corporations Code § 1600(c) Defendant

24 Haas provided such confidential information to Quartzview and

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1    others.

2    28.   Defendants, their agents, servants and employees have taken

3    and secreted valuable ore from the workings of OSTO for their own

4    purposes and converted the same to their own use and benefit and

5    for the purposes of misleading the investors of Quartzview.

6    29.   The false and misleading statements and representations of

7    fact rather than opinion had the intended effect and depressed the

8    value of the securities of OSTO held by Plaintiffs and other

9    stockholders from ten dollars (US) per share to less than one

10   dollar (US) per share on or about March 1, 2022. The acts and

11   omissions of Defendants have caused the stock holders of OSTO to

12   lose confidence in management's skill, ability and honesty.

13   30. On or about 03/02/2021 Defendants Quartzview, Hass and Does 1

14   through 10 published to the holders of the securities of OSTO a

15   manipulative tender offer containing false, misleading and

16   fraudulent information of and concerning OSTO and its management.

17   A true and correct copy of the tender offer is attached hereto as

18   exhibit "C".

19   31. The true facts concerning the false and misleading statements

20   contained in the tender offer were:

21       A.   The management of OSTO operated the property in a

22   reasonable and businesslike manner.

23       B.   No environmental or minimal issues existed.

24       C.   No discharge or minimal of toxic waste occurred under

25

1  the direction and control of Management.

2      D.    No issues or minimal of air quality existed.

3      E.    Management operated the Mine Property consistent with

4  the regulations promulgated by the United States Dept. of Labor

5  Mine Safety and Health Administration.

6      F. Management maintained a secure business environment and no

7  theft of explosives had occurred.

8      G. Other false, incomplete and manipulative statements

9  calculated to gain control of OSTO.

10 32.  At the time and place said offer was made, Defendants and

11 each of them knew that they did not have the funding to pay for

12 the outstanding shares of OSTO, that they would not pay for the

13 shares of OSTO that were subject to acceptance of the tender offer

14 and that the tender offer was manipulative and based upon an

15 ongoing campaign to disparage management and the value of OSTO.

16 33. Plaintiffs other than OSTO and numerous other owners of the

17 securities of OSTO accepted the offer made by Defendants.

18 34.  Following the acceptance of the offer Defendants refused to

19 pay for the securities to Plaintiffs and at the same time asserted

20 in filings with the Security and Exchanges Commission of the

21 United States and all other shareholders of the OSTO that they

22 owned all of the securities encompassed by the accepted offers

23 even though they had not consummated the transactions and continue

24 to make such representations.

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

35.  On or about November 3, 2022 Defendants purported to hold a special meeting of the Stockholders of OSTO and at that meeting purported to remove Plaintiffs Miller, and O'Neill as officers and directors of the OSTO and to elect Douglas W. Charlton, and Charles Crompton Jr.as officers and directors.

36.  The said special meeting of the stockholders and all actions taken at said meeting and pursuant to said meeting is and are null, void and of no legal effect and without right or privilege: The meeting was called by misrepresentation of the shares held by those calling it, was called in violation of the rules governing such meetings by the bylaws of OSTO, was called without a valid quorum being present, was based upon misrepresentations of the conduct of management and the productivity of the OSTO and called through improper, unauthorized and wrongful means. In part Defendants made the following specific representations of and concerning OSTO, and its management:

A. That OSTO not in compliance with the rules and regulations of the United States Dept. of Labor Mine Safety and Health Administration. When the truth was that OSTO was in compliance with all pertinent rules and regulations;

B.   That Michael Miller was under investigation by the United States Securities and Exchange Commission.  When the truth was that no such investigation existed.

C.   That the present Board of Directors had refused to

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1  provide information to the stockholders of OSTO. When the truth

2  was that all pertinent information had been provided.

3      D.  That OSTO had transferred some of its properties to

4  Michael Miller for no consideration. When the truth is that no

5  such gift had ever occurred.

6      E. That management had stolen gold from OSTO.

7      F. That management was responsible for rising water levels in

8  the workings of OSTO.

9      E. And other and further statements and omissions calculated

10  to obtain control of OSTO.

11  37. Following the improper usurpation of the management of the

12  OSTO, Defendants caused the water pumps required to maintain water

13  levels below production areas to become inoperative and thereby

14  allowing water to rise and impinge upon valuable mining areas and

15  to operate the workings of OSTO to be further degraded and

16  operated in an inefficient, un-miner like and unprofessional

17  manner to the degradation of the value of the OSTO and its

18  outstanding shares

19  38.  Following the improper usurpation of the management of the

20  OSTO Defendants caused a false and fraudulent statement of

21  information to be filed with the Secretary of State of California

22  and thereafter used a copy of that filed statement to close the

23  bank account of the OSTO, withdraw its funds and convert them to

24  their own use.

25

14

FIRST CLAIM FOR RELIEF

Manipulation of securities to gain control

39.  The activities, representation of facts known by Defendants to be untrue, suborning of employees and the acts and omissions of the Defendants and each of them constituted a trick or device and manipulative acts to gain control of OSTO.

SECOND CLAIM FOR RELIEF

False and Misleading Statements in Connection with a Tender Offer

40.  Defendants omitted to disclose the following material facts in connection with the tender offer:

A. that they and each of them would not pay for the securities that Plaintiff's and the other shareholders in OSTO agreed to see to Defendants prior to the date that Defendants asserted their ownership rights to the securities

B. that they and each of them would fail and refuse to maintain the underground workings in condition to allow the continued expansion of mining operations of the OSTO for the benefit of OSTO and the non-selling shareholders;

C.  that the statements made of and concerning the lack honesty, truthfulness, skill and business ability of management were made for the purpose of manipulating the price of the securities of OSTO and control of OSTO.

D. That the offer was made for cash consideration only when Defendants did not have and still does not have the cash

15

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1  consideration to pay for the shares subject to the tender offer.

2      E. That Defendants would not pay for the securities subject

3  to the tender offer when the offer was accepted by the owners

4  thereof.

5  41.  The statements and omission to disclose alleged were in

6  violation of the Security and Exchange act of 1934, § 14(e).

7  42.  The representations and omissions alleged were made with

8  knowledge of the materiality of the representations and omissions

9  or negligently and carelessly.

10 43. Plaintiff's and other shareholders have been damaged in the

11 diminution of fair market value of the shares through the

12 manipulative actions of Defendants and prejudgment interest.

13

14                    THIRD CLAIM FOR RELIEF

15                     Declaratory Relief

16 44.An actual and existing dispute now exists between Plaintiffs

17 and Defendants in that Plaintiffs contend that:

18     A.   Defendants manipulated the market for the securities of

19 OSTO to gain control of OSTO.

20     B.   Defendants activity in manipulating the stock of OSTO

21 caused the value of its stock to be depreciated over time.

22     C.   But for Defendants manipulative activity the Stock of

23 OSTO would have traded at or about ten dollars (US) ($10) per

24 share as of May 1, 2019.

25

16

1   D.   Defendants did not fully compensate the individual

2   Plaintiffs for the stock in OSTO that they purportedly purchased

3   from the individual Plaintiffs.

4   E.   The stock transactions recited between Defendants and

5   holders of the securities in OSTO as recited in all Amended

6   Schedules 13D filed by Defendant Quartzview with the Security and

7   Exchange Commission on or about January and February 2022 fail to

8   disclose that the transferee(s) were not fully compensated or not

9   compensated at all for the stock reported as beneficially owned or

10  controlled.

11  F.   Defendants do not hold or control sufficient shares of

12  the stock of OSTO to call for a special meeting of the share-

13  holders and have never held or controlled a sufficient number of

14  shares to do so.

15  G.   All activities undertaken by Defendants and each of them

16  purporting exercise corporate governance or control of OSTO are

17  null, void and of no effect.

18  H. The removal of Plaintiffs as officers and directors of

19  OSTO and the replacement with Defendants as officers and directors

20  was null, void and of no effect and that Plaintiffs continue to

21  constitute the only lawful board, officers and governance of OSTO.

22  45.  Plaintiffs are informed and believe that Defendants and each

23  of them dispute such contentions.

24  46.  It is appropriate for the Court to make its declaratory

25

1  judgment of the rights and obligation of the parties in the

2  premises to avoid a multiplicity of litigation.

3  47.  Plaintiffs desire such a declaration.

FORTH CLAIM FOR RELIEF

5  Violation of California Corporations Code §§ 25400-25304

6  48.  Defendants Haas and Quartzview made the representation

7  knowing that they were false and with the intention of depressing

8  the price that share of OSTO were traded.  As a direct and

9  proximate result of those representations some of the holders of

10  the stock of OSTO were convinced that the price would be depressed

11  and fall lower in reaction to the representations and acts

12  alleged.  They then agreed to sell their shares for the offered

13  price of one dollar (US) per share.

14  49. The individual defendants have been damaged in the amount of

15  nine dollars (US) per share owned or as according to proof.

Breach of Contract

17  Breach of Contract by OSTO against Quartzview

18  50.  On a date unknown to Plaintiff at present but continuing to

19  the present Quartzview, Inc. breached its contract with OSTO in

20  the following respects;

21  A.  By disclosing to third persons proprietary information

22  belonging to OSTO;

23  B.  By disparaging the business operations of OSTO;

24  C.  By falsely reportion violations of law and

25

1 administrative regulations to various governmental agencies and

2 subdivisions;

3   D.   By suborning employees of OSTO to act against the

4 interests of OSTO and to secrete and operate surveillance cameras;

5   E.   And disrupting the business operations of OSTO by

6 constantly and falsely publishing false and damaging statements of

7 and concerning the management of OSTO and by otherwise mismanaging

8 the affairs of OSOT.

9 51.  OSTO has been damaged in the minimum sum of one hundred

10 twenty-five million dollars.

11                    FIFTH CLAIM FOR RELIEF

12                    Breach of Contract

13 52.      By failing and refusing to pay for the stock of

14 Plaintiffs in OSTO Defendants have breached the accepted tender

15 offers damaging Plaintiffs and other stock-holders in the amount

16 agreed upon. Plaintiffs have been damaged according to proof

17                    Recission of Sale

18 53.  There has been a complete failure of consideration for the

19 sale of the Stock of Plaintiffs and other stock-holders and

20 accordingly Plaintiffs are entitled to rescind the sale of stock

21 and offers to tender any fund actually paid, less the damage

22 Defendants have caused to said Plaintiffs and otherwise do equity.

23                    SIXTH CLAIM FOR RELIEF

24                    Elder Financial Abuse

25

54.  In perpetrating the acts and omissions alleged herein
Defendants engaged in Elder Financial Abuse as defined by Calif.
Welf. & Inst. Code. § 15610.30(a), Defendants and each of then
knew or should have known that the afore alleged conduct that
their conduct would be harmful to the individual Plaintiff who are
Elders as alleged and other stock-holders.

55.  The individual Plaintiffs and other stock-holders who are
Elders withing the meaning of Calif. Welf. & Inst. C. § 15610.27
has been damaged as alleged.

SEVENTH CLAIM FOR RELIEF

Theft (Calif. Pen Code § 484)

56.  The actions of Defendants in purposing to gain control of
OSTO, in removing and keeping valuable ore and embezzling the
funds of OSTO amount to theft as is defined by Calif. Pen Code §
484. Plaintiffs are entitled to their damages trebled and their
attorney fees.

EIGHTH CLAIM FOR RELIEF

Unfair Competition (Calif. Bus. & Prof Code. §17200)

57.  The acts and omissions of Defendants and each of them
constitute economic damage to all Plaintiffs.

58.  The acts and omissions of Defendants and each of them are in
violation of Calif. Bus. &. Prof. Code. § 17200 in that they are
false, deceptive and unfair and in violation of Calif. Bus. &.

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1  Prof. Code. § 17500.

2  59.  It is appropriate for the Court to enjoin and restrain

3  Defendants and each of them from exercising any corporate

4  authority or power relating to OSTO, to engage in any further

5  market manipulation of the securities of OSTO, to remove any ore

6  from the premises or works of OSTO, from making any further

7  disparaging remarks of or concerning the management of OSTO or

8  from taking any further action damaging, or depreciating the value

9  of the OSTO.

10  60.  It is further appropriate for the Court to order Defendants

11  and each of them to account for all rents, issues and profits of

12  the OSTO in their possession or transferred to any other person

13  including any stock-holder of Quartzview.

14  61.  It is further appropriate for the Court to assess a Civil

15  Penalty against Defendants and each of them.

16  62.  It is further appropriate that the Court assess Plaintiffs'

17  attorney fees as damages and costs from Defendants.

18      WHEREFORE Plaintiffs pray Judgment against Defendants and

19  Each of them as follows:

20  1.  For General Damages to Plaintiff the Original Sixteen to One

21  Mine, Inc. in the amount of one hundred twenty-five million

22  dollars ($125,000,000.)

23  2.  For general damages for the domination of the value of the

24  stock of the individual Plaintiffs in the amount of not less than

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1  nine dollars ($9,00) per share.

2  3.    For a declaration of this Court that:

3  A.    Defendants manipulated the market for the securities of OSTO

4  to gain control of OSTO.

5     B.    Defendants activity in manipulating the stock of OSTO

6  caused the value of its stock to be depreciated over time.

7     C.    But for Defendants manipulative activity the Stock of

8  OSTO would have traded at or about ten dollars (US) ($10) per

9  share as of May 1, 2019.

10    D.    Defendants did not fully compensate the individual

11 Plaintiffs for the stock in OSTO that they purportedly purchased

12 from the individual Plaintiffs.

13    E.    The stock transactions recited between Defendants and

14 holders of the securities in OSTO as recited in all Amended

15 Schedules 13D filed by Defendant Quartzview with the Securities

16 and Exchange Commission fail to disclose that the transferee(s)

17 were not fully compensated for the stock reported.

18    F.    Defendants do not hold or control sufficient share of

19 the stock of OSTO to call for a special meeting of the share-

20 holders and have never held or controlled a sufficient number of

21 shares to do so.

22    G.    All activities undertaken by Defendants and each of them

23 purporting exercise corporate governance or control of OSTO are

24 null, void and of no effect.

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1    H. The removal of Plaintiffs as officers and directors of

2    OSTO and the replacement with Defendants as officers and directors

3    was null, void and of no effect and that Plaintiffs continue to

4    constitute the only lawful board, officers and governance of OSTO.

5    4.    That the Court enjoin and restrain Defendants and each of

6    them, their agents, servants and all persons acting in concert

7    with them from performing or engaging in all of the following:

8    From exercising any corporate authority or power relating to

9    OSTO, to engage in any further market manipulation of the

10   securities of OSTO, to remove any ore from the premises or works

11   of OSTO, from making any further disparaging remarks of or

12   concerning the management of OSTO or from taking any further

13   action damaging, or depreciating the value of the OSTO.

14   5. For the Court to order Defendants and each of them to account

15   for all rents, issues and profits of the OSTO in their possession

16   or transferred to any other person including any stock-holder of

17   Quartzview.

18   6.    That Plaintiffs' damages be trebled.

19   7.    For Court to assess a Civil Penalty against Defendants and

20   each of them.

21   8.    For reasonable Attorney fees.

22   9.    For Costs of Suit; and,

23   10.   For such other and further relief as the Court deems just and

24   proper.

25

23

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

1

2   DATED:2/28/2023                          */s/ John Vodonick, Ph.D.*
                                             John Vodonick
3                                            Attorney for Plaintiffs

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Original Complaint the Original Sixteen to One Mine, Inc. vs. Quartzview, et al.

EXHIBIT A

# License and Service Agreement

This License and Service Agreement ("Agreement") is made and entered into as of September 24th 2012 ("Effective Date"), by and between *Quartzview Corporation.* ("Quartzview"), a California corporation with its principal office at 10 Timber Ridge Lane, Scotts Valley, CA 95066 and *Original Sixteen to One Mine, Inc.* ("Company"), a California corporation with its principal office at Post Office Box 909, Alleghany, California, 95910 and gold mine at Alleghany, California, including all access to the patented and unpatented mineral rights (the "Mine") defined in Exhibit 3, and collectively (the "Parties").

**WHEREAS,** Quartzview is a developer of deep sensing technology ("Quartzscan") and believes it can develop and demonstrate its ability to detect the presence of gold at a range of up to ten feet through solid quartz; and

**WHEREAS,** Quartzview has expertise in developing software algorithms, capable of reading from the Quartzscan that could be applied to a three dimensional digital map of the Mine to evaluate likely gold content, estimate potential gold reserves, and target most likely locations and drilling patterns within the Mine to find gold and other precious metals ("Gold"); and

**WHEREAS,** the Company has been mining the Mine using various methods and believes that modern technology may be able to increase Gold detection and output and is interested in securing the advantages of Quartzscan to locate and mine gold more effectively;

**NOW THEREFORE,** the Parties, for consideration, the receipt and adequacy of which is hereby acknowledged, agree to enter this Agreement according to the following terms and conditions

## 1.     Appointment

Contingent upon Quartzview closing a round of investment finance ("Investment"), and providing the working capital loan described in Section 14 of this Agreement, Company hereby appoints Quartzview as its exclusive provider of gold location services (Locational Services") at the Mine for a period of ten (10) years from the Effective Date (the "Term") which Agreement shall be recorded and run with the land.

## 2.     License

Quartzview grants the Company a license ("License") to use and have used Quartzscan in the Mine during the initial term and any subsequent terms of this Agreement, (the "Terms").

## 3.     Compensation

The Company shall pay Quartzview the compensation described in Exhibit 2 as consideration for the License and Locational Services.

## 4.     Verification of output

Since the compensation payable to Quartzview is related to the output and value of native Gold found, extracted, and sold from the Mine, Company shall grant Quartzview the right, within 14 days of the end of every month to a copy of all output and sales records, and a right to have an independent auditor of its choice, conduct an annual audit of all the records of the Mine up to the point of receipt of proceeds. The Company shall have the right to approve the selected auditor, subject to reasonable criteria, and shall receive at least 30 day's written notice of the intended audit to allow time for preparation.   Quartzview shall be responsible for the cost of such audit,

6mm
11-06-12

however in the event that the audit reveals an under-reporting of more than 5% of the reported quantity or amount, then Company shall pay for the entire cost of the audit, together with payment for the under-reported amount, and interest and penalty of 10% of the under-reported amount. If the audit reveals an overpayment by the Company, the amount of overpayment shall be paid back to the company within 30 days.

**5.    Relationship**

The relationship of the Parties established by this Agreement is that of independent contractors, and nothing contained in this Agreement shall be construed to (i) give either party the power to direct and control the day-to-day activities of the other, (ii) constitute the Parties as partners, joint ventures, co-owners or otherwise as participants in a joint or common undertaking. All financial obligations associated with any party's business are the sole responsibility of the respective party.

**6.  Warranty**

Quartzview hereby warrants that

(i)     Quartzscan, and Locational Services using Quartzscan shall perform in accordance with the published specification and be free of defects in materials and workmanship.

(ii)    Quartzscan shall be operated in a miner-like manner at all times in accordance with the health and safety codes laid down from time to time by the Company, MSHA, CALOSHA or OSHA, whichever is the more rigorous.

(iii)   The warranty does not include any assertions as to whether Gold, or any other materials will be found in the Mine, in economic quantities, if at all.

(iv)    The warranty set forth herein is offered in lieu of all other warranties expressed or implied.

**7.   Limitation of Liability by Quartzview**

Quartzview's liability set forth in this agreement will be limited to

(i)     the lower of one million dollars ($1,000,000) or the accumulated value of the compensation actually received from Company under this Agreement during the twelve months period preceding any claim.

(ii)    claims arising from the drilling of test bores as a result of the negligence of its employees, managers, agents, directors, and officers.

(iii)   Quartzview shall be required to carry liability and workers comp insurance of one million dollars ($1,000,000) with an A graded carrier, and to provide Company with a named certificate of coverage.

In no event will Quartzview be liable for special, indirect or consequential damages, or any damages whatsoever resulting from loss of use, data or profits arising out of, or in connection with this Agreement or the use or performance of Quartzscan whether in an action of contract or tort including negligence.

**8.   Limitation of Liability by Company**

Company's liability shall be limited to claims arising from all activities and operations in the mine other than test bores.

In no event will Company be liable for special, indirect or consequential damages or any damages whatsoever resulting from loss of use, data or profits arising out of, or in connection

2

with this Agreement or the process of mining any locations in the Mine selected as a result of Quartzscan recommendations, whether in an action of contract or tort including negligence.

### 9.  Obligations of Company

(i) The Company is an expert in operating mines, and mine safety, and shall be required to offer Quartzview employees and contractors instruction in mine access and safety before they can enter the Mine. The Company shall have the right to test and certify Quartzview employees and contractors for safety proficiency, including the influence of drug and drink usage, and to deny access to the Mine to any person not so certified.

(ii) The Company shall have the right to observe Quartzview's employees, management and independent contractors within the Mine and shall at all times have the right to terminate operations and evacuate the Mine, if, in Company management's opinion, there is a safety risk or breach of Mine rules and regulations as far as they relate to the provision of Locational Services under the terms of this Agreement.

The Company shall be responsible, at Company's expense, for all ongoing operational and infrastructure cost including utilities, air and electricity, required for the operation of the Mine, while Quartzview shall be responsible for the incremental expense arising from test bores conducted by Quartzview.  The Company shall have the right to decline or delay the start of any mining proposal or recommendation of a Location submitted by Quartzview resulting from their test bores and data analytics if they believe that the cost is not justified by the risk. The Company is under no obligation to increase underground access to areas that are inaccessible at the time of signing the agreement. Inaccessible means they are not safe for a working heading, unsafe and do not meet State or Federal regulations. The Company retains its rights to detect, explore and develop its mine, including those areas designated in Exhibit 3.

(iii) As a result of any such declination or delay, Quartzview shall, for a period of five years from the date of declination, have the right but not the obligation to mine the Location, at their expense, and to receive 85% of the proceeds from the spot sale of the Gold extracted instead of the fee described in Exhibit 2. Any mining activities carried out pursuant to such exercise shall be performed in a miner-like manner either by labor provided by the Company subject to contract, or by third party labor supplied by Quartzview, provided however that the conditions set forth in Sections 6 to 9 of this Agreement are at all times observed to the satisfaction of the Company.

(iv) The Company shall be responsible for publishing a written security policy identifying security measures as they relate to the storage and protection of Quartzview equipment and samples left in the Mine, and Gold, ore and extracts mined from the Mine, up to the point of sale. The policies shall be reviewed from time to time and no less frequently than every six months to ensure that security is commensurate with the then level of risk. The current security policy is attached as Exhibit 5

(v) .  *Intentionally left blank*

(vi) The Company warrants that there is no litigation, EPA, health and safety, or other claims against the Company or the Mine and that they indemnify Quartzview against any such claims that may arise during the term of this Agreement.

3

with this Agreement or the process of mining any locations in the Mine selected as a result of Quartzscan recommendations, whether in an action of contract or tort including negligence.

### 9. Obligations of Company

(i) The Company is an expert in operating mines, and mine safety, and shall be required to offer Quartzview employees and contractors instruction in mine access and safety before they can enter the Mine. The Company shall have the right to test and certify Quartzview employees and contractors for safety proficiency, including the influence of drug and drink usage, and to deny access to the Mine to any person not so certified.

(ii) The Company shall have the right to observe Quartzview's employees, management and independent contractors within the Mine and shall at all times have the right to terminate operations and evacuate the Mine, if, in Company management's opinion, there is a safety risk or breach of Mine rules and regulations as far as they relate to the provision of Locational Services under the terms of this Agreement.

The Company shall be responsible, at Company's expense, for all ongoing operational and infrastructure cost including utilities, air and electricity, required for the operation of the Mine, while Quartzview shall be responsible for the incremental expense arising from test bores conducted by Quartzview. The Company shall have the right to decline or delay the start of any mining proposal or recommendation of a Location submitted by Quartzview resulting from their test bores and data analytics if they believe that the cost is not justified by the risk. The Company is under no obligation to increase underground access to areas that are inaccessible at the time of signing the agreement. Inaccessible means they are not safe for a working heading, unsafe and do not meet State or Federal regulations. The Company retains its rights to detect, explore and develop its mine, including those areas designated in Exhibit 3.

(iii) As a result of any such declination or delay, Quartzview shall, for a period of five years from the date of declination, have the right but not the obligation to mine the Location, at their expense, and to receive 85% of the proceeds from the spot sale of the Gold extracted instead of the fee described in Exhibit 2. Any mining activities carried out pursuant to such exercise shall be performed in a miner-like manner either by labor provided by the Company subject to contract, or by third party labor supplied by Quartzview, provided however that the conditions set forth in Sections 6 to 9 of this Agreement are at all times observed to the satisfaction of the Company.

(iv) The Company shall be responsible for publishing a written security policy identifying security measures as they relate to the storage and protection of Quartzview equipment and samples left in the Mine, and Gold, ore and extracts mined from the Mine, up to the point of sale. The policies shall be reviewed from time to time and no less frequently than every six months to ensure that security is commensurate with the then level of risk. The current security policy is attached as Exhibit 6.

(v) The Company warrants that there is no litigation, EPA, health and safety, or other claims against the Company or the Mine other than ~~as disclosed in Exhibit 6 to this Agreement~~ and that they indemnify Quartzview against any such claims that may arise during the term of this Agreement.

void

3

### 10.  Term and Termination

a)  <u>Term</u>

The Agreement shall commence on the Effective Date and automatically expire on December 31 of the 10th year following the Effective Date.   The Agreement shall thereafter automatically be renewed for additional 12 month periods unless either party gives notice of termination to the other no later than November 30 of the then current year. If the Agreement terminates or is terminated other than for cause, Quartzview shall have the right to continue to receive its agreed share of all Gold mined by the Company from all Locations identified by Quartzview at the date of Termination.   Further, to the extent that the Company has, for any or no reason, not commenced mining of any Locations as at the date of Termination, Quartzview shall have the right to mine such Locations under the terms and conditions described in Section 9 (iii) to this Agreement.

b)  <u>Termination for Cause (Breach)</u>

If one party defaults in the performance of any provision of this Agreement; then the non-defaulting party may give written notice to the defaulting party to remedy the fault within thirty (30) days.   If the non-defaulting party gives such notice and the default is not remedied during the thirty (30) day period, then this Agreement may be terminated for cause by the non-defaulting party.

c)  <u>Termination for Cause (Insolvency)</u>

This Agreement shall terminate for cause, without notice upon (i) the institution by or against any party of insolvency, receivership or bankruptcy proceedings or any other proceedings for the settlement of any party's debts, (ii) any party's making an assignment for the benefit of creditors, or (iii) any party's dissolution or ceasing to do business.   The right to terminate for insolvency shall not be applicable in the event of proceedings contested in good faith so long as the dispute remains unresolved.

### 11.  Property Rights, Confidentiality, Non-Solicitation & Non-Circumvention

a)  <u>Intellectual Property Rights</u>

Company agrees that Quartzview owns all rights, title, and interest in the Quartzscan technology and all techniques, processes and know-how deployed during the operation of Locational Services, together with exclusive right to all improvements, developments and derivative products, technologies and techniques that may now or hereafter be developed during the provision of Locational Services under the terms of this Agreement, whether at the Mine, or elsewhere. The use by Company of any of these rights is authorized only for the purposes herein set forth, and upon termination of this Agreement for any reason such authorization shall cease.

b)  <u>Confidentiality</u>

The Parties acknowledge that they will have access to certain information and materials concerning the other parties' business, plans, customers, technology, and products that are confidential and of substantial value, which value would be impaired if such information were disclosed to third parties. The Parties agree respectively that they will not use in any way for its own account or the account of any third party, nor disclose to any third party, any such confidential information revealed to it as confidential.   In the event that the Parties agree that disclosure of any confidential information to a third party, such as a mining contractor, is required, then the agreement for such disclosure shall be documented and signed by both parties, and the third party shall sign a non-disclosure agreement provided by Quartzview prior to such disclosure. The Parties take every reasonable precaution to protect the confidentiality of such

4



information. The obligations herein will not apply to any information which: i) at the time of disclosure is in public domain; or ii) after disclosure becomes part of the public domain without breach of the receiving party ; or iii) is already in the possession of the receiving party at the time of disclosure ; or iv) is obtained by the receiving party from a third party without obligations of confidentiality; v) has developed independently of the confidential information.

c)   Non Solicitation, non Circumvention

In recognition of the investment made by Quartzview in developing its intellectual property rights, and the close working environment between Quartzview employees and Mine employees, Company hereby agrees not to solicit, nor to actually hire any employees of Quartzview, directly or indirectly to the maximum extent permitted by law. The Company further agrees not to reverse engineer or otherwise replicate the Quartzscan devices, nor the related analytic software, nor to participate in any development programs internally, or with third parties for the purpose of developing alternate solutions for displacing Quartzscan.

In recognition of the investment made by Company in developing its Mine and mining operations, and the close working environment between Quartzview employees and Mine employees, Quartzview hereby agrees not to solicit, nor to actually hire any employees of the Company, directly or indirectly to the maximum extent permitted by law. Quartzview further agrees not to replicate the Company's mining policies, procedures and techniques, nor to participate in any mining activities on its own account for the duration of this Agreement, except as provided in Clause 9 to the Agreement.

### 12.  Third-Party Infringement

Quartzview agrees to indemnify and hold Company harmless from all damages and costs, including legal fees, which may be assessed on Company in any action by third parties alleging infringement of its Quartzview trademark or patent, provided that, Company shall give Quartzview a written notice promptly after Company becomes aware of all actions, or claims or threats of any patent or trademark infringement or other suits instituted against it, and shall give Quartzview an opportunity to elect to take over, settle or defend the same through counsel of its own choice and under its sole discretion and at its own expense , and will make available to Quartzview in the event of such election, all defenses against such actions, claims or proceedings, known or available to Company.

Quartzview shall have no liability for any settlement of any such action which is entered into without its express written approval. Quartzview shall not have any liability for any claim of patent infringement resulting from (i) the use of Quartzscan in a manner other than its intended use, or (ii) the use of Quartzscan with any other products which caused the patent infringement, or (iii) the use of Quartzscan modified by any parties other than Quartzview without prior written consent of Quartzview.

The Company warrants that it has free and clear interest to all Gold extracted from the Mine without payment of royalty or extraction fees, that it will be responsible for the entire cost of defending and substantiating any claims or litigation arising from such claims, and that any royalty payments or extraction dues that may at any time become due and payable as a result of such claims shall be deducted in full from the Company's share of the sale proceeds.

### 13. General Provisions
a)    Governing Law and Arbitration



5



This Agreement shall be governed by and construed under the laws of the State of California.

b)    Entire Agreement

With respect to the subject matter of this Agreement, this Agreement:  (i) sets forth the entire agreement between the Parties hereto and any persons who were in the past or who are now representing either of the Parties hereto, (ii) supersedes all prior understandings and communications between the Parties hereto or any of them, oral or written, and (iii) constitutes the entire agreement between the Parties hereto.   Each party hereto acknowledges and represents that this Agreement is entered into after full investigation and that no party is relying upon any statement or representation made by any other that is not embodied in this Agreement. Each party hereto acknowledges that he or it shall have no right to rely upon any amendment, promise, modification, statement, or representation made or occurring subsequent to the execution of this Agreement unless the same is in writing and executed by each of the Parties hereto.

c)    Notices

All communications which may be or are required to be given by either party to the other herein shall (in the absence of any specific provision to the contrary) be in writing and delivered or sent by prepaid registered mail facsimile transmission, or receipted email (provided the sender obtains evidence or verification of transmission receipt) to the Parties at their following respective addresses:

Quartzview Corporaation:                     Original Sixteen to One Mine Inc.
10 Timber Ridge Lane,                          Alleghany, CA 95910
Scotts Valley,
CA   95066 USA
Attention:  Legal department               Attention: Michael Miller
Fax: (913)-273-0064                             Fax:      (530)-287-3455

and if such communication is sent by prepaid registered mail, it shall be conclusively deemed to have been received at the time of delivery or transmission.   Either party may from time to time change its address or facsimile number herein before set forth by notice to the other of them in accordance with this section.

d)    Force Majeure

Non-performance by any party shall be excused to the extent that performance is rendered impossible by strike, fire, flood, governmental acts or orders or restrictions, failure of suppliers, or any other reason where failure to perform is beyond the reasonable control of and is not caused by the negligence of the non-performing party.

e)    Authority

The signatories to this Agreement warrant that they have all necessary authority from their respective boards to commit and bind the respective parties in this Agreement.

f)    Assignment

(i) The rights and obligations of Company pursuant to this agreement may not be assigned in whole or in part without the prior written consent of Quartzview.   Company may not subcontract, in whole or in part, its obligations pursuant to this agreement to any other party without prior written consent of Quartzview.   While Quartzview agrees to consider in good

6

faith any suggestions by Company for assignment or subcontracting, Quartzview reserves the *right* to withhold its consent to any proposed assignment or subcontracting in its sole discretion in the event that it has sound reason to believe the assignee has a competitive interest in analyzing and reverse engineering the Quartzscan technology for competitive purposes.

(ii) The rights and obligations of Quartzview pursuant to this agreement may not be assigned in whole or in part without the prior written consent of The Company.    Quartzview may not subcontract, in whole or in part, its obligations pursuant to this agreement to any other party without prior written consent of the Company.    While Company agrees to consider in good faith any suggestions by Quartzview for assignment or subcontracting, the Company reserves the right to withhold its consent to any proposed assignment or subcontracting in its sole discretion in the event that it has sound reason to believe the assignee undermines the security of the Mine and its gold reserves.

### 14. Working Capital Facility

Contingent on raising the Investment and being appointed as exclusive provider of Locational Services as described in Section 1 of this Agreement, Quartzview shall deposit the sum of $500,000 into the Company's bank account, which facility (Facility") shall be drawn at any time at the absolute discretion of the Company.    The Facility shall not be used to pay or reduce its debt to Michael Miller, President of the Company. The Facility shall be repaid in full within six months of the earlier of the Term or Termination as defined in Section 10 of this Agreement. The Facility shall be secured by means of a hypothecated note on the Mine recorded in the name of Michael Miller. The Company shall, at its sole discretion, be permitted to repay the Loan at any time, without penalty, provided that Quartzview has received cumulative proceeds in service fees equal to the Investment under the terms of this Agreement. Quartzview shall have the right to convert the Facility into shares of common stock of the Company at the conversion price of $1.00 per share at any time during the Term of the Facility.

### 15.    Counterparts

This Agreement may be signed in two counterparts each of which shall be deemed to be an original, but which together will form a single Agreement as if both parties had executed the same document.

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed by duly authorized representatives as of the Effective Date.


Original Sixteen to One Mine, Inc.                Quartzview Corporation


By _Michael M. Miller_                    By _Roger Haas_

Name: Michael M Miller                    Name: Roger Haas

Title: President                        Title: CEO

Date                            Date _10/30/12_

# Exhibit 1

### Description of Locational Services

Quartzview will provide a turnkey service, identifying the co-ordinates and directions of recommended mining locations within the Mine. Locations shall by selected by mutual agreement of the parties taking into account Gold prospects, ease of current access, facilities, cost and safety, and shall be selected from the map shown on Exhibit 3, hereto.

Services to be provided at the expense of Quartzview will include the following, which may be amended from time to time, at the sole discretion of Quartzview, to reflect the experience gained, and best use of analytic data accumulated over the Term of the Agreement. Quartzview will at all times provide directions to Company management regarding their Locational Services activities and locations, and require Company management to provide clear and safe access and working conditions at all times.

1. Produce a digital 3 dimensional map of the mine including all existing tunnels, rises, footwall and hanging wall elevations, bores based on mine plans, and historic data provided by the Company
2. Build analytic model to measure output and findings, and create forecasts
3. Produce a prioritizing list of exploratory bores and recommended bore patterns and depths
4. Bring in proprietary Quartzscan equipment and calibrate and acclimatize to the Mine
5. Conduct at least 100 test bores or five thousand feet a year
6. Insert Quartzscan and gather Gold readings
7. Gather all drill fines, name and number for reference and remove from Mine for expert analysis
8. Update analytic models
9. Make proposals to Company management for areas to open up to mining.
10. Assist management where necessary

**Exhibit 2**

### Revenue Process and Compensation

In consideration for the Locational services, Company will pay Quartzview a service fee as follows during the Term of the Agreement:

**1.** **Basis of Service Fee**

Once a Location has been identified and reported to Company prior to start of mining, and agreed as a viable target ("Target") by the Parties, a Target will be defined as:

(i) The area between the hanging wall and footwall; and

(ii) The area between the current work face/ access point to the furthest extent of the contiguous gold bearing quartz; and

(iii) Targets that blend into other targets defined by Quartzview will be treated as one for purposes of measuring Yield and fees as described below; and

(iv) The Target Yield will be determined after all the economically recoverable gold bearing ore has been removed and processed and the Parties have mutually agreed that the target has been exhaustively mined;

**2.** **Allocation of Proceeds between the Parties**

(i) Starting from Jan 1, 2013, the first 1,000 oz of gold mined every calendar year, regardless of Target, shall be Allocated to the Company; then

(ii) 30% of the Proceeds from sale of Yield regardless of Target up to the lesser of the Investment or $2.5 million shall be allocated to Quartzview, then

(iii) thereafter Proceeds shall be allocated to Quartzview, based on the final Yield from each completed Target, as described in the following table with the remainder to the Company;

| If total Yield from target pocket is | Quartzview Service Fee as % of Total Yield from Pocket |
|---|---|
| 0 to 10 ozs. of gold | 0 |
| 11 - 300 ozs. of gold | 5% |
| 301-1,000 ozs. of gold | 10% |
| 1001-3,000 ozs. of gold | 15% |
| 3001-5,000 ozs of gold | 20% |
| 5,001 ozs plus | 25% |

(Note: these bands are total yield NOT incremental yield)
As an example, if a Target yields a total of 3,020 ounces of gold and is the only pocket mined in a calendar year, the Company would take 1,000 ounces, Quartzview would take 20% of 3,020 ounces and the Company would take the balance. This assumes that Quartzview had fully recovered the value of the Investment prior to this target.

(iv) Quartzview shall have a right, at its expense, to have an independent auditor of its choice conduct an annual audit of all the financial records of the Mine to verify output, reported sales proceeds and the service fees payable to Quartzview



and to support any resulting corrections in service fees payable. The Company shall have the right to approve the selected auditor, subject to reasonable criteria, and shall receive at least 30 day's written notice of the intended audit to allow time for preparation. Quartzview shall be responsible for the cost of such audit, however in the event that the audit reveals an under-reporting of more than 5% of the reported quantity or amount, then Company shall pay for the entire cost of the audit, together with payment for the under-reported amount, and interest and penalty of 10% of the under-reported amount.

(v) Payments will be made by the Company to Quartzview within 7 days of receipt of Proceeds by the company.

(vi) The target recovery rate of gold from ore is 94%. The scrap ore containing residual currently unrecoverable gold will be identified, tracked, and stored and if the economics of recovery change, Quartzview shall be entitled to benefit from the recovery of any subsequent incremental gold at the 20% rate.

(v) In the event that this Agreement is not renewed at the end of the Term, Quartzview shall be entitled to receive the Service Fee arising from its share of Proceeds of any then identified Targets that have not been fully mined at the end of the Term, as and when they are mined, in accordance with (iii) above.

## Exhibit 3

### Mine area subject to Locational Services

Beginning at the 800 portal the levels and ground in between known as 250 foot level, 400 foot level, 800 foot level, 21 tunnel, 1000 foot level, 1300 foot level to their existing accessible end lines as at the date of this Agreement. All shafts, winzes or stopes, including the 49 winze, Sixteen to One shaft, Tightner shaft, North Shaft, 1064 winze. Quartzview may, from time to time request approval for mining in other areas of the mine. The Company shall have the right to reject such requests if (i) the proposal presents a safety risk, or (ii) the cost of such proposal is in excess of the likely benefits.



| Quartzview Agreement - Exhibit 3 |
| --- |
| Original Sixteen to One Mine, Inc. |
| MSHA ID#: 04 01299    527 Miners Street - P.O. Box 909 Alleghany, CA 95910    Phone#: (530) 287-3223 |

**Exhibit 4**

### Performance milestones

Unless otherwise agreed in writing by the parties, Quartzview shall use its best efforts to meet or exceed the following performance milestones:

| Number | Date | Description |
|---|---|---|
| 1 | 90 days from funding | Present functional 3D model with accurate elevations tied into benchmark data |
| 2 | Dec 31, 2012 | Drill test patterns underground in three locations and place detectors |
| 3 | June 30, 2013 | Demonstrate ability to identify and distinguish gold at a range of 8 feet in solid quartz |
| 4 thru 10 | Dec, 31, 2014 thru 2022 | Drill at least 50 test bores with an aggregate depth of five thousand feet per calendar year |

**Exhibit 6**

## Security Procedures

This procedure is required to be followed by ALL employees at this mine site.    There are no exceptions.

1. When arriving at the mine site leave the keys to your vehicle in the ignition.    In case of an emergency your vehicle can be moved.
2. Put your lunch on the bench.
3. Change into your underground clothes, grab lunch, go to work.

Before taking underground clothes home to wash, they must be checked by an assigned employee before they leave the office building.

If you need to leave work in the middle of the day, contact your supervisor.    Plan ahead.    Your lunch box must be checked when leaving in the middle of the day.

**When you find gold in your heading:**
1. Contact the Specimen Boss or the Mine Manager.
2. You must pull out of your heading and not return until the Specimen Boss or Mine Manager arrives. NO ONE IS ALLOWED IN A HEADING ALONE WHERE ANY GOLD IS SHOWING.    There are NO exceptions.    Violation is grounds for immediate dismissal.
3. ALL gold put into high-grade sacks will be sealed by the Specimen Boss and the Miner at the face.
4. The Specimen Boss or designee will take the sealed high-grade sacks to the vault.
5. All high-grade sacks must be logged on the daily high-grade production sheet, providing total weight, est. gold content, ore sack number and date.    All entries must be initialed.

Ore bag seals:
1. The Specimen Boss or designated person will have pre-numbered seals.
2. All ore sacks will be sealed at the location the gold is found.
3. If for any reason a seal must be broken, the broken seal is to be placed in the ore sack, and resealed. There must always be two people present in the presence of gold.

Miners responsibilities:
1. When gold is found in your heading you must leave until the Specimen Boss or Mine Manager arrives. No one is allowed in the heading until the Specimen boss or Mine Manager arrives.    There are no exceptions.    You are the one in control and will be held responsible.
2. If you are working in a heading when gold is found elsewhere in the mine, you are required to stay in your designated work area unless you are authorized to leave.

**Mill Procedures**
During the processing of gold, two people are required except when:
1. Gold is in the retort and the fire is lit.
2. Gold is in the furnace and the fire is lit.
3. Gold is in a company approved lock-up and it is locked.
4. Gold is in the High Grade Ball Mill.

Gold Bar Routing Reports
1. Entries to this report must have two signatures or initials next to the entry.
2. Gold bars poured must be numbered and entered onto the Gold Bar Routing Report.
3. The routing Report must always accompany the gold that it is tracking.
4. When transferring the report to another person you must have them sign the report acknowledging they received the gold.    You do not have to do this if you are putting the gold into the vault.

EXHIBIT B

## MUTUAL NONDISCLOSURE AGREEMENT

THIS MUTUAL NONDISCLOSURE AGREEMENT is made and entered into as of August 10, 2012, between Quartzview Corporation., a California corporation, having a place of business at 10 Timber Ridge Lane, Scotts Valley, CA 95056 and Original Sixteen to One Mine Inc, having a place of business at Alleghany, California)

1.    Purpose.  The parties wish to enter into a business opportunity of mutual interest and in connection with this opportunity, each party may disclose or has already disclosed to the other certain confidential technical and business information which the disclosing party desires the receiving party to treat as confidential.  Quartzview may disclose intellectual properties confidential processes and secret algorithms for modeling and detecting gold locations while Original Sixteen to One Mine may disclose information on security procedures, mine maps and locations, mining techniques, etc.

2.    "Confidential Information" means any information disclosed previously or in the future by either party to the other party, either directly or indirectly, in writing, orally or by inspection of tangible objects (including without limitation documents, prototypes, samples, plant and equipment), which is designated as "Confidential," "Proprietary" or some similar designation.  Confidential Information shall include, without limitation, the items set forth in the Appendix attached hereto, whether or not so designated upon disclosure.  Information communicated orally shall be considered Confidential Information if such information is confirmed in writing as being Confidential Information within a reasonable time after the initial disclosure.   Confidential Information may also include information disclosed to a disclosing party by third parties.  Confidential Information shall not, however, include any information which (i) was publicly known and made generally available in the public domain prior to the time of disclosure by the disclosing party; (ii) becomes publicly known and made generally available after disclosure by the disclosing party to the receiving party through no action or inaction of the receiving party; (iii) is already in the possession of the receiving party at the time of disclosure by the disclosing party as shown by the receiving party's files and records immediately prior to the time of disclosure; (iv) is obtained by the receiving party from a third party without a breach of such third party's obligations of confidentiality; (v) is independently developed by the receiving party without use of or reference to the disclosing party's Confidential Information, as shown by documents and other competent evidence in the receiving party's possession; or (vi) is required by law to be disclosed by the receiving party, provided that the receiving party gives the disclosing party prompt written notice of such requirement prior to such disclosure and assistance in obtaining an order protecting the information from public disclosure.

3.    Non-use and Non-disclosure.   Each party agrees not to use any Confidential Information of the other party for any purpose except to evaluate and engage in discussions concerning a potential business relationship between the parties.  Each party agrees not to disclose

any Confidential Information of the other party to third parties or to such party's employees, except to those employees of the receiving party who are required to have the information in order to evaluate or engage in discussions concerning the contemplated business relationship. Neither party shall reverse engineer, disassemble or decompile any prototypes, software or other tangible objects which embody the other party's Confidential Information and which are provided to the party hereunder.

4.    <u>Maintenance of Confidentiality</u>.    Each party agrees that it shall take reasonable measures to protect the secrecy of and avoid disclosure and unauthorized use of the Confidential Information of the other party. Without limiting the foregoing, each party shall take at least those measures that it takes to protect its own most highly confidential information and shall ensure that its employees who have access to Confidential Information of the other party have signed a non-use and non-disclosure agreement in content similar to the provisions hereof, prior to any disclosure of Confidential Information to such employees. Neither party shall make any copies of the Confidential Information of the other party unless the same are previously approved in writing by the other party. Each party shall reproduce the other party's proprietary rights notices on any such approved copies, in the same manner in which such notices were set forth in or on the original.

5.    <u>No Obligation</u>.    Nothing herein shall obligate either party to proceed with any transaction between them, and each party reserves the right, in its sole discretion, to terminate the discussions contemplated by this Agreement concerning the business opportunity.

6.    <u>No Warranty</u>.    ALL CONFIDENTIAL INFORMATION IS PROVIDED "AS IS". EACH PARTY MAKES NO WARRANTIES, EXPRESS, IMPLIED OR OTHERWISE, REGARDING ITS ACCURACY, COMPLETENESS OR PERFORMANCE.

7.    <u>Return of Materials</u>.    All documents and other tangible objects containing or representing Confidential Information which have been disclosed by either party to the other party, and all copies thereof which are in the possession of the other party, shall be and remain the property of the disclosing party and shall be promptly returned to the disclosing party upon the disclosing party's written request.

8.    <u>No License</u>. Nothing in this Agreement is intended to grant any rights to either party under any patent, mask work right or copyright of the other party, nor shall this Agreement grant any party any rights in or to the Confidential Information of the other party except as expressly set forth herein.

9.    <u>Term</u>. The obligations of each receiving party hereunder shall survive until such time as all Confidential Information of the other party disclosed hereunder becomes publicly known and made generally available through no action or inaction of the receiving party.

10.    <u>Remedies</u>.    Each party agrees that any violation or threatened violation of this Agreement may cause irreparable injury to the other party, entitling the other party to seek injunctive relief in addition to all legal remedies.

11.    <u>Miscellaneous</u>.    This Agreement shall bind and inure to the benefit of the parties hereto and their successors and assigns.  This Agreement shall be governed by the laws of the State of California, without reference to conflict of laws principles.  This document contains the entire agreement between the parties with respect to the subject matter hereof, and neither party shall have any obligation, express or implied by law, with respect to trade secret or proprietary information of the other party except as set forth herein.  Any failure to enforce any provision of this Agreement shall not constitute a waiver thereof or of any other provision.  This Agreement may not be amended, nor any obligation waived, except by a writing signed by both parties hereto.  This Agreement may be signed in counterparts, each of which shall be deemed an original, and all of which together shall constitute one instrument.

QUARTZVIEW CORPORATION.                    (RECIPIENT)

By: _____              By: _____

Name: Simon Westbrook                    Name: michael miller
      T Roger Haas

Title: CFO  CEO                          Title: President

Date: August 10, 2012                    Date: August 14, 2012

CONFIDENTIAL INFORMATION

-3-

EXHIBIT C

Dear Shareholder of the Original Sixteen to One Mine.          5/17/2019

My name is Roger Haas. I am a fellow shareholder and also the CEO of Quartz View Inc. We founded Quartz View to use Silicon Valley technology to help locate gold in the Sixteen to One Mine. We have spent many hours working underground alongside the Sixteen to One mining crews. We had people on site 3 or 4 days a week for over 3 years. We found gold, but also learned many troubling things about how the mine was operated and the challenges it faces.

The current Board of Directors has not been responsive to Quartz View's many requests to address these serious issues, and Quartz View cannot continue to operate under the current management regime. In an effort to improve operations, address regulatory problems and ensure the future viability of this historic mining operation, Quartz View is now prepared to make a "tender offer" to purchase a controlling interest in the Company's shares. **This presents a unique opportunity for you to be able sell your shares at a price that is twice the 52-week high reported by Bloomberg, or $.20 per share!**

If you have been paying attention to the Mine's financial reports, you will see that it has reported a loss in all but three of the last twenty-three years. In addition, shareholders equity fell from $2.2 million in 2000 to negative $1.3 in 2017. According to the Mine's filing with the SEC dated December 31, 2018, the company appears to be insolvent, with $2,152,912 accounts payable and assets of $862,814. That filing can be located at:

https://www.sec.gov/Archives/edgar/data/74925/000007492519000001/tenkeighteen.txt

In addition, there is a pending civil complaint against the Mine by the California Water Quality Control Board that could result in very serious fines. The links below shows the time frame to bring the mine into compliance as required by the board.
https://www.waterboards.ca.gov/centralvalley/board_decisions/adopted_orders/sierra/r5-2018-0019.pdf

https://www.waterboards.ca.gov/centralvalley//board_decisions/tentative_orders/sixteentoone/r5-2019-0506_aclc.pdf

Despite all of these challenges, Quartz View is prepared to invest in change for the future. Accordingly, if we can secure commitments from shareholders representing at least 50.1% of the shares outstanding, we are prepared to purchase your shares for 20 cents a share. If you would like to take advantage of this limited time opportunity to sell your shares at a generous premium, please fill out the form below and send it by mail or email to Quartz View's attorney, Carlos Leet.

If you have any questions, please don't hesitate to contact me, Roger Haas at 408-672-5610 or by email at rogerhaas@cruzio.com.

Roger Haas

Yes! Please include my shares of the Original Sixteen to One Mine in the proposed Tender Offer by Quartz View to purchase these shares at $.20 per share if at least 51% of the outstanding shareholders accept the offer. The form below shows the number of shares I own and want to sell. *I understand this is not a current offer to purchase shares, but a "Tender Offer" that will only be effective if 51% of shareholders agree to participate.*

Shares owned and want to sell _____

Name on the shares _____

Address _____

Email address _____

Phone number _____

Cell Number _____

Send this form to Carlos Leet or email it to him at the address below.

### Carlos Leet

(408) 753-5486 Work
wcl@leetlaw.com

210 N 4th street ste 201
San Jose, Ca. 95112